**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| Landmark Holdings of Florida, LLC, | Case No. 2:25-bk-00397 |
| | Jointly Administered With |
| Landmark Management Services of Florida, LLC, | Case No. 2:25-bk-00398 |
| Landmark Rehabilitation Hospital of Columbia, LLC, | Case No. 2:25-bk-00399 |
| Landmark Hospital of Athens, LLC, | Case No. 2:25-bk-00400 |
| Landmark Hospital of Cape Girardeau, LLC, | Case No. 2:25-bk-00401 |
| Landmark Hospital of Columbia, LLC, | Case No. 2:25-bk-00402 |
| Landmark Hospital of Joplin, LLC, | Case No. 2:25-bk-00403 |
| Landmark Hospital of Savannah, LLC, | Case No. 2:25-bk-00404 |
| Debtors.[1] | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING PAYMENT OF EXPENSE DEPOSITS IN CONNECTION WITH**
**DIP FINANCING, AND (II) GRANTING RELATED RELIEF**

**(Emergency hearing requested on or before Thursday, May 15, 2025)**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

their undersigned counsel, file this motion (the "Motion"), seeking (1) entry of an order (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Landmark Holdings of Florida, LLC (1217); Landmark Management Services of Florida, LLC (7031); Landmark Rehabilitation Hospital of Columbia, LLC (5424); Landmark Hospital of Athens, LLC (2745); Landmark Hospital of Cape Girardeau, LLC (1155); Landmark Hospital of Columbia, LLC (5424); Landmark Hospital of Joplin, LLC (9493); and, Landmark Hospital of Savannah, LLC (8003).

"Order") authorizing the Debtors to pay one or more expense deposits in an amount not to exceed $100,000, in the aggregate, in connection with debtor-in-possession financing ("DIP Financing"), and (2) granting related relief. In support of the Motion, the Debtors submit as follows:

## I.  Jurisdiction, Venue and Predicates for Relief

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.  The bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "Bankruptcy Code"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 9013-1 of the Local Rules for the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules").

## II.  BACKGROUND

### A.     The Chapter 11 Cases

3.  On March 9, 2025 (the "Petition Date"), each of the Debtors filed with the Court their respective voluntary petitions under chapter 11 the Bankruptcy Code, commencing the above-captioned chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

4.  On April 1, 2025, the Office of the United States Trustee appointed the Joint Committee of Creditors Holding Unsecured Claims (the "Committee"), comprised of the following five members: J&R Fuller, LLC d/b/a PharmaCare Services, Medline Industries, LP, TFG Billing, LLC, Upright Healthcare Workforce, LLC, and LRS Healthcare, LLC.

5.      The Debtors own and operate five long-term acute care ("LTAC") hospitals located in Missouri and Georgia. Debtor Landmark Management Services of Florida, LLC provides management services to a sixth LTAC hospital located in Florida that is not owned by the Debtors. Landmark's first hospital was opened in 2006. The Debtors' hospitals provide critical care to patients that require a higher level of care for a longer period of time than typical hospitals provide.

6.      The Debtors filed these cases with the intention of continuing their operations in the ordinary course of business and seeking to reorganize their financial affairs.  Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Debtors' Chapter 11 Case Management Summary* (the "Case Management Summary"), which is incorporated herein by reference.  Additional facts in support of the specific relief sought herein are set forth below.

**B.      Expense Deposits Required by Potential Providers of DIP Financing**

7.      On March 12, 2025, the Debtors filed their *Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Use Cash Collateral and Granting Adequate Protection* [Docket No. 24] (the "Cash Collateral Motion").  As described in the Cash Collateral Motion, the Debtors require access to cash collateral to ensure that they are able to continue operating during these chapter 11 cases and to preserve the value of their estates.

8.      On March 14, 2025, the Court entered its *Interim Order Authorizing the Debtors to Use Cash Collateral and Granting Adequate Protection* [Docket No. 49] (the "First Interim Cash Collateral Order").  On April 11, 2025, the Court entered its *Second Interim Order Authorizing the Debtors to Use Cash Collateral and Granting Adequate Protection* [Docket No. 109] (the "Second Interim Cash Collateral Order"), thereby extending the Debtors' use of cash collateral.

9.      Since the inception of these cases, the Debtors have been transparent about their likely need for additional funding to cover certain expenses associated with these cases.  In particular, the Debtors require DIP Financing to successfully run a sale process and consummate a transaction for the benefit of their creditors and other constituents.  The Debtors have requested that their prepetition lender, Amerant Bank, N.A. ("Amerant"), provide DIP Financing.  To date, Amerant has not agreed to provide DIP Financing in any amount.  As a result, with the support of their investment banker, Raymond James & Associates, Inc. ("Raymond James"), the Debtors initiated a marketing process to identify potential third parties to provide DIP Financing.  Raymond James has contacted approximately 20 third party financing sources, and more than 10 have entered into non-disclosure agreements. To date, Raymond James has procured at least three non-binding term sheets for DIP Financing.

10.     The Debtors have provided copies of the non-binding term sheets to both Amerant and the Committee through their respective counsel.  The term sheets are not commitments or agreements by either the Debtors or the respective counterparty to participate in any financing transaction.  Once the Debtors determine the best binding DIP Financing option, the Debtors will file a separate motion requesting that the Court approve such DIP Financing.

11.     While the term sheets have varying financial terms, they are consistent in one respect.  Each requires that the Debtors pay an expense deposit or "work fee" upon execution of the term sheet to cover the costs associated with the counterparties' due diligence before deciding whether to proceed with the DIP Financing.  Based on discussions with each of the counterparties, the Debtors believe that they are unwilling to proceed without the Debtors funding the expense deposit. As a result, at present, the Debtors are unable to execute any of the term sheets and move forward on due diligence.

12.     The upfront expense deposits requested range in amount from $20,000 to $75,000, which amounts the Debtors believe to be reasonable given that the Debtors have requested DIP Financing in amount up to $5 million.  To be clear, the counterparties are requesting that the Debtors pay the expense deposit <u>prior</u> to moving forward with the proposed due diligence and incremental expense reimbursement may be required to finalize an agreement.

13.     Each of the expense deposits requested is nonrefundable and will be credited against actual expenses incurred by the prospective lenders.  In addition, the term sheets require that the Debtors reimburse the prospective lenders for legal expenses incurred in connection with any later documentation of the DIP Financing.  The Debtors will require that the proposed lenders meet milestones for performing due diligence prior to advancing any further amounts beyond the initial advance.

14.     The Debtors seek authority to provide expense deposits to one or more prospective lenders in an amount up to $100,000, in the aggregate, so that the Debtors may, in their business judgment and sole discretion, enter into one or more DIP Financing term sheets.  Such request is without prejudice to the Debtors' rights to seek authority to pay additional amounts as expense deposits or "work fees" pursuant to the procedures set forth below.

15.     The Debtors believe that entry into a DIP Financing term sheet is the necessary first step in obtaining DIP Financing and, as set forth above, is critical to the Debtors' ability to fund their sale process and other expenses, and maximize the value of their estates.

16.     The Debtors will exercise their business judgment in determining how many term sheets to execute in an effort to secure the best DIP Financing option possible.  Granting the relief requested herein will give the Debtors the flexibility needed to advance amounts to potentially

different lenders for purposes of commencing the due diligence phase and ultimately create the best opportunity to secure favorable DIP Financing.

17.     To the extent that the Debtors determine, in their business judgment, that they require additional amounts in excess of the $100,000, the Debtors may request authority to pay such additional amounts by providing written notice to Amerant and the Committee and by submitting an agreed order for entry by the Court.  The Debtors shall not be required to submit any such agreed order for hearing, and the Court may enter any such agreed order without a hearing. Notwithstanding the foregoing, the Debtors reserve their rights to request a hearing on the matter to the extent that either Amerant or the Committee refuses to consent to additional amounts.

### III.  BASIS FOR RELIEF REQUESTED

A.     **Payment of Expense Deposits for DIP Financing Is a Sound Exercise of the Debtors' Reasonable Business Judgment Under Section 363(b) of the Bankruptcy Code**

18.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Whether the Court should approve the use of assets pursuant to section 363(b) in a particular case is a matter left to the Court's discretion, giving due consideration to the sound business judgment of the proponent of the particular transaction.  *See In re Wildwood Villages, LLC*, 2021 WL 1784074, at *2 (Bankr. M.D. Fla. Feb. 22, 2021) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the trustee exercised sound business judgment.") (citing *In re Lionel Corp.*, 722 F.2d 1063, 1072 (2d Cir. 1983) ("The rule we adopt requires a judge determining a § 363(b) application expressly find from evidence presented before him at the hearing a good business reason to grant such application.")); *In re Knott*, 2015 WL 251705, at *2 (Bankr. M.D. Fla. Jan. 20, 2015) (considering a proposed § 363(b) transaction under the business judgment standard); *Fulton State Bank v. Schipper (In re Schipper)*,

6

933 F.2d 513, 515 (7th Cir. 1991) (holding that section 363 is satisfied where the debtor has "an articulated business justification" for the business transaction).

19.     Moreover, "[a] debtor's business judgment is entitled to great deference. Generally, the business judgment standard is satisfied if a debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Courts should not generally interfere with business decisions absent a showing of bad faith, self interest, or gross negligence." *Wildwood Villages, LLC*, 2021 WL 1784074, at *3 (citations and quotations omitted); *see also Knott*, 2015 WL 251705, at *2 ("Once a trustee provides such sound business reasons, his or her business judgment generally is entitled to a certain amount of deference."); *In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D. Fla. 2019) ("A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or a whim or caprice."); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near Herculean task.").

20.     Here, taking steps to secure DIP Financing is critical.  The Debtors likely cannot fund the ongoing sale process, cover other expenses associated with these cases, and ultimately close a sale absent DIP Financing.  As is clear from the Debtors' current projections, a lack of DIP Financing would create liquidity issues for the Debtors' estates.  Accessing DIP Financing will facilitate the Debtors' ability to maximize value for their creditors and other parties in interest.

21.     Payments of expense deposits (or "work fees") in similar situations have been approved by courts in other districts.  *See, e.g., In re Golfsmith Int'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Oct. 31, 2016) (approving payment of a deposit in connection with entry into a work fee letter to obtain a replacement DIP financing); *In re Panda Temple Power,*

*LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. Dec. 18, 2017) (approving payment of fees and expenses of prospective exit lenders); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 1, 2017) (approving fees and expenses of prospective exit lenders); *In re CJ Holding Co.*, Case No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 2, 2016) (authorizing debtors to pay work fee and reimburse due diligence expenses incurred); *In re Nebraska Book Company, Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. May 14, 2012) (approving fees and expenses of potential exit lenders); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Nov. 12, 2009) (authorizing debtors to pay work fees to and/or reimburse due diligence expenses incurred by prospective lenders in connection with financing).

22.     In addition, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Payment of the expense deposits or "work fees" is necessary and appropriate to carry out these cases in accordance with the provisions of the Bankruptcy Code.

23.     In light of the foregoing, the Court should approve the payment of expense deposits up to $100,000, in the aggregate, as a sound exercise of the Debtors' business judgment.

**B.     The Stay of the Order Should be Waived**

24.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Order be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) is waived. As set forth above, funding the expense deposits is a prerequisite to the prospective lenders commencing due diligence.  The Debtors

already anticipate requiring a compressed due diligence period given the funding needs of these cases and cannot further delay paying the expense deposits to secure potential DIP Financing.

## IV.  <u>Notice</u>

25.    The Debtors will serve notice of this Motion on (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) counsel for Amerant; (d) all known creditors holding secured claims against the Debtors' estates; (e) the Committee; (f) counsel for the Committee; and (g) all parties that have filed a request for service of filings pursuant to Bankruptcy Rule 2002.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Order authorizing the Debtors, in their reasonable business judgment, to fund expense deposits in connection with the term sheets for DIP Financing in an amount up to $100,000, in the aggregate, without prejudice to the Debtors' rights to seek authority to pay additional amounts as set forth herein; and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: May 8, 2025
Fort Myers, Florida

Respectfully submitted,

/s/ *Jennifer E. Wuebker*
**HUNTON ANDREWS KURTH LLP**
Jamie Z. Isani (FL 728861)
333 SE 2nd Avenue, Suite 2400
Miami, Florida 33131
Telephone:      (305) 810-2500
Facsimile:      (305) 810-2460
Email:          jisani@hunton.com

*- and -*

Justin F. Paget (admitted *pro hac vice*)
Jennifer E. Wuebker (admitted *pro hac vice*)
951 E. Byrd Street
Richmond, Virginia 23219
Telephone:      (804) 788-8200
Facsimile:      (804) 788-8218
Email:          jpaget@hunton.com
                jwuebker@hunton.com

*Counsel to the Debtors and*
*Debtors in Possession*